IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                        Plaintiff,                                OPINION AND ORDER

        v.
                                                                  18-cr-143-wmc
CHRISTOPHER M. HYNEK,

                        Defendant.

On September 1, 2020, defendant Christopher M. Hynek pleaded guilty to one count of social security fraud in violation of 42 U.S.C. § 408(a)(4).  That charge stems from his uninterrupted receipt of permanent disability insurance benefits from the Social Security Administration ("SSA") between 2002 to 2016, despite Hynek failing to disclose material improvements in his medical condition after April 2007, which the government claims allowed him to engage in substantial gainful activity.  However, the parties remain far apart as to the loss suffered by the SSA and a second victim (private disability insurer, Thrivent Insurance) as a result of his fraud.  On January 29, February 2 and 5, 2021, the court held a hearing at which both sides presented evidence on this subject.  For the reasons explained below, the court finds that the loss period actually runs from April 2007 through September 2018, resulting in a total loss amount calculation of $98,256.00 for both guideline and restitution purposes.

BACKGROUND

Before suffering an injury in June of 2000 that left him with chronic neuropathic pain in both arms, Hynek had worked full time at his father's printing business as a

pressman and general manager, earning an average of $5,000 per month.  In January 2007, Hynek was awarded monthly disability payments from the SSA retroactive to September 2002.  In addition, Hynek received monthly disability payments from his private insurer Thrivent beginning in August 2002.  In 2013, however, the Office of the Inspector General began an investigation based on an anonymous tip that Hynek was again working at his father's printing business and being paid covertly.  As a result of that investigation, Hynek's SSA benefits were terminated effective May 13, 2016, for engaging in substantial gainful activity that he had not disclosed to the agency.  Thrivent also terminated Hynek's benefits after he stopped sending in pay stubs as requested by the insurer in September of 2018.

The parties dispute the loss amount for purposes of restitution and the guideline calculations.  Restitution in this case is governed by 18 U.S.C. § 3663, as the provisions of the Mandatory Victim Restitution Act do not apply to Hynek's Title 42 offense.  *See* 18 U.S.C. § 3663A(c)(1) (enumerating the offenses that fall under the mandatory act). Although restitution is not mandatory, the court may order restitution "to any victim of such offense," and "if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense."  18 U.S.C. § 3663(a)(1).  Here, Hynek and the government agreed he would pay restitution to the SSA and to Thrivent "for all losses relating to the offense of conviction and all losses covered by the same course of conduct or common scheme or plan as the offense of conviction." (Dkt. #80 at 2.)  Unfortunately, this resulted in the parties kicking down the road virtually all questions as to the materiality of defendant's conduct before May 20, 2016, when the defendant concedes his failure to disclose a material change in his treating physician's opinion as to his physical abilities.

After briefing and an evidentiary hearing, the parties' positions could not be further apart. The government contends that Hynek was *never* entitled to disability payments because he was *always* engaged in substantial gainful activity for his father's business. Thus, between the SSA's disability payments of $487,053.60 and Thrivent's payments of $406,383.41, the government asserts a total loss amount of $893,437.01, arising out of defendant's fraud, and it asks for this same amount in restitution. (*See* dkt. ##112 at 12, 127 at 197.) In contrast, Hynek asserts that there was *no* loss to the SSA or Thrivent because the information he should have reported would still have resulted in his continuing to receive the same benefits. In particular, Hynek maintains that any work he did at the print shop was for a benevolent employer (his father), who allowed significant accommodations unavailable in the general labor market, including keeping irregular hours, taking unscheduled breaks, and simply disappearing from work for days due to pain flare ups. *See* 20 C.F.R. § 404.1573(c) ("If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity.").

While the parties would leave the court with an all-or-nothing proposition, the submissions of the parties, the evidence and argument presented at the evidentiary hearing, as well as the record taken as a whole, support a different result based on the preponderance of the evidence.

## OPINION

Having already obtained a criminal conviction, the burden here for the government is to prove a loss amount by a preponderance of the evidence, rather than beyond a

3

reasonable doubt.[1]  18 U.S.C. § 3664(e) ("Any dispute as to the proper amount of type of restitution shall be resolved by the court by the preponderance of the evidence.").  A preponderance "requires only that the fact-finder believe that the existence of a fact is more probable than its non-existence, and for the purposes of determining the loss amount, a reasonable estimate is sufficient." *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013).

As a recipient of Title II SSA disability payments, which are only available for total (not partial) disability, Hynek had an affirmative duty to notify the administration of events that may have changed his disability status, including an improvement in his condition, a return to work, an increase in the amount of work, or an increase in earnings. 20 C.F.R. § 404.1588.  Similarly, with respect to Thrivent, Hynek's total disability benefits were contingent on his certifying that he continued to suffer from the qualifying disability, and he was unable to work in his previous occupation or any occupation on a full-time or part-time basis.  (Dkt. #100-1 at 10.)

## I.   Ability to Perform Substantial Gainful Work

As the parties frame the loss amount question, the court must decide on this record if at any point before his benefits were terminated, Hynek would have been found able to

---

[1] Should Thrivent or SSA pursue recovery in civil court, its standard of proof may well be similar. *See Marquez v. Mercedes-Benz U.S.A, LLC*, 2012 WI 57, ¶¶ 36-37, 341 Wis. 2d 119, 815 N.W. 2d 314 (distinguishing the two burdens of proof in civil cases in Wisconsin); *see also Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016) (burden of proof in federal civil cases is proof by a preponderance of the evidence).  However, nothing in this opinion speaks to other avenues of additional loss recovery for either victim in this case, should they choose to pursue it.  To the contrary, this court must exercise in assigning a loss amount for each victim (and by agreement, also for restitution).

4

work had either victim known of the full scope of his actual work abilities and activities. Thrivent must also provide residual benefits for injuries that prevent the policyholder from "performing some but not all of the material and substantial duties of an Occupation for wage and profit" and "causes a Loss of Earned Income of at least 20% of" average monthly earned income.  (Dkt. #100-1 at 9.)  Thrivent's representative testified that Hynek had stopped "sending in pay stubs in order to calculate the residual disability benefit" when his benefits were terminated in 2018.  (Dkt. #127 at 194.)  However, it is unclear whether ever received residual, as opposed to total disability benefits from Thrivent.  Moreover, the government has failed to prove by a preponderance of the evidence that Hynek's disability *ever* caused a loss of earned income of less than 20%, the court would only be guessing as to a proper loss calculation or restitution payment for Thrivent.

In adjudicating whether a social security disability benefits claimant is disabled in the first instance, an administrative law judge ("ALJ") must apply a long-established, five-step analysis.  *See* 20 C.F.R. § 416.920(a)(4).  Here, the government relies solely on this first step -- determining whether a claimant is engaged in substantial gainful activity -- arguing that he does not clear even this initial hurdle.  "Substantial gainful activity" is work that involves doing significant physical *or* mental activities, or any other "gainful work activity" that is "usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(a), (b).  In fact, a claimant can be found to be engaging in substantial gainful activity without earning *any* income.  *See Callaghan v. Shalala*, 992 F.2d 692, 695-96 (7th Cir. 1993) (unprofitable business owner was engaging in substantial gainful activity).

5

For this reason, defendant's "work may be substantial even if it is done on a part-time basis," or involves less activity or responsibility, or less wages than before his injury. 20 C.F.R. § 404.1572(a). Monthly income that meets a specified threshold can also suggest substantial gainful activity.[2] Thus, the government argues it has met its burden of proof here by showing by a preponderance of the evidence that defendant engaged in substantial gainful activity under any of these thresholds during part or all of the period he was received disability benefits.

To begin, the ALJ found in 2007 that defendant Hynek had *not* engaged in substantial gainful activity since his June 20, 2000, injury. In support, the ALJ concluded that the money Hynek continued to receive from his father's business as "wages" after that date was in fact a gift, and that Hynek had told his treating sources that he was working only because he was too embarrassed to admit otherwise. The ALJ further concluded that Hynek suffered a severe impairment (step two), but did not have an impairment or combination of impairments that met or equaled the listing of impairments found at 20 C.F.R. Part 404, Subpart P, App. 1 (step three). The ALJ further found that Hynek was not able to perform any past relevant work (step four), and considering Hynek's age, education, work experience, and inability to perform the full range of even sedentary work, there was not a significant number of jobs in the national economy for Hynek (step five). Thus, Hynek was originally deemed disabled from June 20, 2002, through January 26, 2007, the date of the ALJ's decision.

---

[2] Relevant here, this monthly threshold ranged from $780 in 2002 to $1,130 in 2016. *See* Substantial Gainful Activity, Social Security, https://www.ssa.gov/oact/cola/sga.html.

The parties agree that the court is not bound by the ALJ's findings. Indeed, as noted, the government's position runs directly contrary to those findings by maintaining that Hynek had always been engaged in substantial gainful activity under the very first step of the five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."). However, having chosen to put all its eggs in that basket, it also follows that if the government does not meet its burden with respect to any portion of the period during which Hynek received benefits, those corresponding payments may not be included in the court's calculation of the loss amount or restitution. Moreover, after a person is found to be entitled to disability benefits, the SSA may only terminate benefits if substantial evidence demonstrates that: (1) there has been medical improvement in the individual's impairment; *and* (2) he or she is now able to engage in substantial gainful activity. *See* 42 U.S.C. § 423(f)(1).

### A.  Payments Covering the Period before April 2007

For this reason, the court will exclude from the loss amount and restitution Thrivent payments made to the defendant before April 2007 ($164,840.20), as well as the SSA catch-up payment made to cover the period before April 2007 ($144,198). (*See* dkt. ##100-5 at 1; 127 at 123.) First, the ALJ has unique expertise in his field and had the opportunity to assess Hynek's credibility in January 2007, something this court is not unable to do retroactively. In particular, the ALJ had a chance to consider Hynek's explanation at that time as to his reasons for telling his treating sources that he was still working and for continuing to receive payroll payments through his father's business

through 2002. The government argues with reason that the payroll checks, which the ALJ concluded were gifts based on Hynek's testimony, evidence questionable accounting and tax practices by both the defendant's and his father's business, but the standard for disregarding an ALJ's credibility finding is high -- it must be "patently wrong," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and the soundness of these practices for business or tax purposes is not the question before this court. Nor do these questionable practices compel a conclusion that the money Hynek received was not a gift, such that Hynek's father was untruthful before the grand jury when he testified, consistent with the ALJ's past finding, that he had gifted his son this money as a stopgap after his injury to support his grandchildren and ensure that Hynek's family could continue to cover expenses. (Dkt. #106 at 12.)

Second, there can be no dispute that Hynek suffers from chronic pain as a result of a freakish, serious injury to both shoulders, nor that in the years after the accident, Hynek has sought answers and solutions from numerous treating sources, as his primary care physician credibly testified at the evidentiary hearing before this court. (Dkt. #127 at 77-84, 87-88.) Certainly, as the government points out, this court has the benefit of more evidence than the ALJ, but to the extent this additional evidence may suggest that Hynek made material misrepresentations about his activities in applying for SSA benefits in the first place, Hynek only pleaded guilty to a one-count information expressly covering a period of time *beginning* in April 2007 through October 2018, expressly excluding any illegal

8

conduct before the ALJ's *January* 2007 decision awarding disability benefits.[3]  Specifically, the indictment states that "[f]rom in or about April 2007," defendant knew of "the improvement of his disability and medical condition which allowed substantial gainful activity," and he did not disclose this information "with an intent to fraudulently secure payment" from the SSA.  (Dkt. #82.)

Similarly, at the plea hearing, Hynek admitted knowing after April 2007 that "he was doing activities that should [have] been reported to" the SSA -- in particular, the work activities he was performing for his father's printing business.  (Dkt. #96 at 36-38.)  Even then, however, the defendant did *not* admit to any failure to disclose a material change in his medical condition or other material misrepresentation before April 2007, nor did the information or parties' plea agreement require such an admission.  In light of the ALJ's disability finding, the language of the information, Hynek's actual admissions, and the record in this case, therefore, the court will limit its consideration of the parties' evidence to the period beginning in April 2007.  *Cf. Hughey v. United States,* 495 U.S. 411, 413 (1990) (courts may award restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction").

---

[3] The government initially charged Hynek in a 14-count indictment with wire fraud, social security fraud, and theft of government money as a result of a scheme to receive full disability payments from Thrivent and the SSA while he worked at the Hynek family printing business without disclosing his work activity to either victim.  That indictment also alleged his scheme involved Hynek's father compensating him surreptitiously for work at Hynek Printing by devising ways to pay him through third parties, including his mother and wife.  However, the one-count information to which Hynek pleaded guilty does not include the allegation of such a sweeping scheme.

**B. Payments Covering the Period Beginning in April 2007**

For this period of time, the government alleges that the SSA overpaid Hynek by $342,855.60. (*See* dkt. ##112 at 12, 127 at 191.)  At the plea hearing, Hynek admitted that the government would be able to prove that he withheld material information from the Social Security Administration beyond a reasonable doubt.  (Dkt. #96 at 35.) Specifically, Hynek admitted that he did not report a change in his lifting abilities by his treating physician in 2016, nor that beginning in 2007, he began doing "activities at and around Hynek Printing," which "could have been or should have been materially reported to Social Security . . . that could have made them change their mind as to whether or not [Hynek] should be receiving" benefits.  (Dkt. #96 at 35.)   More specifically, Hynek admitted that he knew after April 2007, he was "doing activities that should [have] been reported" to the SSA, including:  (1) running printing presses and cutters for his personal things; (2) training others on using those presses and cutters; (3) assisting with payroll and IT work; (4) purchasing paper; (5) hiring employees; (6) participating in the 2014 purchase of Spring Printing; (7) being involved in the management of Spring Printing; and (8) training on a certain kind of press and using that press for the business.  (Dkt. #96 at 36-38.)

In support of its position that these activities constituted substantial gainful activity, the government offered the testimony at the evidentiary hearing from Amy Coleman, the assistant district manager of the La Crosse SSA office.  Coleman testified that the disclosure of such activities would likely have resulted in at least the suspension of Hynek's benefits, because they were "meaningful" activities that helped expand his

father's printing business and contributed to its success.  (Dkt. #127 at 118.)  The government also documented that Hynek received checks from the business beginning in 2008, and it disputes that the continued characterization of these payments as mere gifts is contradicted by the nature and extent of work he was admittedly performing and how the checks were issued to him.  (Dkt. #99-3.)  In fact, those checks ranged in amount from $30 to $4,000, were issued nearly every month until 2016, were made out to Hynek, Hynek's children, his father or mother, or "to cash," and regardless of characterization, they all consistently found their way into Hynek's pocket.  For the government, the checks, which continued to be issued even after Hynek was being investigated, establish surreptitious compensation to Hynek for the work he was doing at his father's business, which the SSA would have considered wages for concealed work that, in many months, far exceeded the monthly income threshold for substantial gainful activity.  (Dkt. #127 at 119, 121.)

The government also relies on the argument that issuing Hynek checks in this manner as "gifts" is at best an unsound accounting and tax practice, but the government's strongest evidence for its position that the payments were for substantial work came through witness and grand jury testimony provided by people who worked with Hynek at his father's business during and beyond this period of time.  (Dkt. ##97, 98.)  In general, these statements corroborate much of what the defendant admitted at his plea hearing. For example, Tonia Hanson attested that:  Hynek was not only involved in her 2002 hiring, but then recruited her back to the business in 2012; he serves as a "kind of" manager she contacts most days of the week with work-related issues and when his father is unavailable;

11

and he buys and loads paper, "talks to customers," and does "a lot of computer stuff as well." (Dkt. ##97-2 at 2-3; 97-4 at 12.)  Carolyn Miller, who left Hynek Printing in 2012 but still does contract work for the business, attests that Hynek typically worked around 40 hours a week, "seemed to be in charge," at one point at least did payroll, although not well, and remained involved in high school yearbook sales as late as 2012.  (Dkt. ##97-6 at 2-3; 97-7 at 13.)  Pressman Dustan Walmer, who worked at the business until 2018, characterized Hynek as "technically his boss."  (Dkt. #97-9 at 3.)  Walmer similarly noted that Hynek did payroll for a time, "was the expert" on a digital four-color press, was "more of the 'computer guy'," and bought paper for the business.  (Dkt. #97-9 at 4-6.)

As for Mark Hottmann, from whom Hynek's father purchased Spring Printing in the middle of 2014, he confirmed that it was Hynek who first contacted him about selling his business, and on the day his print shop was sold, it was Hynek who ran the meeting with employees and explained that he would be managing that location for the combined printing business.  (Dkt. #98-9 at 2.)  At least at that time, Hottmann similarly attests that Hynek "was working over 40 hours per week," "worked on computers quite often," "worked on jobs and was always at Spring Printing telling them what to do" and Hottmann further observed, Hynek seemed to have little difficulty cutting and moving paper, or operating a letterpress machine.  (Dkt. #98-9 at 2-3, 8.)  Theron Gobin, who also worked at Spring Printing when it was purchased in 2014, also stated that Hynek hired him to stay on, and Hynek "was the boss over Mark Hottmann to make the transition" happen, as well as the person "in charge of the Spring Printing location" going forward.  (Dkt. #105-3 at 23.)

Additional witnesses similarly describe Hynek as a "supervisor," "the IT person," or at least someone who would troubleshoot printers and computers; and the one who worked to update and expand Hynek printing, did hiring and firing, was "a major part" of the business, and a trainer.  (Dkt. ##98-1 at 4, 98-3 at 2-3, 98-7 at 2, 105-3 at 30, 33, 40, 46, 133-1 at 5.)  Moreover, some witnesses denied that Hynek would have to take time off, or that they had seen Hynek sleeping or resting at work.  (Dkt. ##98-3 at 3, 105-3 at 47; 133-1 at 6.)

Hynek's testimony was most credible in responding that these eyewitness statements give an incomplete picture.  To begin, many of these employees were rarely in a position to observe Hynek directly at work, and their statements include admitted assumptions about the extent of his role within the printing business, including at least some of the events following the acquisition of Spring Printing.  Indeed, Hanson admitted that Hynek's weekly hours vary, and he would often work at night when she was not there and "keep his own hours."  (Dkt. #97-2 at 2.)  Moreover, when she was reinterviewed in 2020 by Hynek's investigator, Hanson further clarified that "she really didn't see [Hynek] that much," because he "was not at work every day."  (Dkt. #105-3 at 58.)  Similarly, Miller testified before the grand jury that although Hynek "worked a lot," he worked nights, "which [she] can't vouch for," except that things she needed done were completed overnight.  (Dkt. #133 at 12.)  Walmer also acknowledged that Hynek's hours varied, and he worked in a separate building from Hynek.  (Dkt. #97-9 at 5-6.)  Phil Lindgard further indicated that he only assumed Hynek was full time and a paid employee.  (Dkt. #105-3 at 30.)  When reinterviewed, Ed Achenbach admitted to making similar assumptions, and

13

indicated that he thought Hynek's father "was running the print shop." (Dkt. #105-3 at 36-37.) Other witnesses, such as Susan Schmuck and Paige Rice, noted that Hynek worked unpredictable, sporadic hours. (Dkt. #133-1 at 4, 9.) And although Rice described Hynek as someone who "organizes things" at work, Schmuck "never [quite] knew what [Hynek] did." (Dkt. #133-1 at 4, 9.) Finally, Hynek highlights the statement of former salesman Doug Myers, who recalled that Hynek stopped using the digital press after he was injured, did not load materials often, and would complain about the pain in his arms. (Dkt. #98-1 at 5.)

These inconsistencies are hardly surprising, since the government offered *no* evidence that Hynek's original accident and diagnosed, chronic neuropathy were ever successfully treated, meaning that Hynek will likely continue to face challenges with episodes of severe pain, longer periods of chronic pain, and a need for flexible hours. Indeed, his treating physician of many years testified at the evidentiary hearing that Hynek's ongoing pain limits him to doing "things that involve his mind," and thus, has required longstanding limitations on heavy lifting and repetitive bending of the elbows, as well as frequent breaks while working. (Dkt. #127 at 77, 85, 89.)

Moreover, a vocational expert, John Meltzer, testified at the evidentiary hearing before this court, consistent with the ALJ's original finding, that Hynek's "exceptional accommodations" at his father's business "could [not] be expected of an employer in the general labor market." (Dkt. #128 at 8.) In particular, Meltzer observed that although Hynek may have performed "a variety of tasks" for Hynek Printing, he also had the ability "to take naps during the workday, ranging anywhere from one to three naps" per day, and

14

required "a limited work schedule where he could come and go as he pleased," and be absent from work for extended periods of time.  (Dkt. #128 at 8.)  Accordingly, Meltzer opined that even with his contributions, a substantial question remains whether Hynek "engage[d] in work or in regular and sustained work."  (Dkt. #128 at 10.)

The government does not account for any of this testimony in its post-hearing brief. In light of these accommodations, and his ongoing, chronic pain, Hynek's ability to consistently maintain full time, gainful employment appears less likely than not, especially outside his father's business.  Certainly, the SSA's guidelines counsel counterbalancing where a claimant requires accommodations related to his impairment to work.  *See* 20 C.F.R. § 404.1573(c) ("If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity.");  Here, Hynek is allowed a flexible schedule with irregular work hours, and requires frequent naps or rest periods.

Moreover, given the inconsistencies, contradictions and imprecise timeframes among the various witness statements from individuals who at times were attempting to recall years-old experiences, and in light of the accommodations Hynek requires, and the lack of medical evidence of any improvement in his condition before 2016, it is difficult to draw conclusions before then, even by a preponderance of the evidence, about when Hynek may have been sufficiently recovered to engage in substantial work, or was engaging in such work, during this period.

Still, the through line for Myers and most of the other witnesses is that Hynek was generally perceived to be a supervisor, akin to a manager at the business.  (Dkt. #98-1 at

15

4.)  As a result, while not able to be involved in regular, physical tasks (although there is evidence that he could at times move and cut paper, as well as work presses), nor reliably be present as most workers, the defendant appears to have been a skilled, experienced, and often managerial contributor to his father's business and its expansion sometime after his accident, even if the amount of time spent at the business and his duties varied.  *Cf. Abrahamson v. Colvin*, No. CV-13-00703-PHX-GMS, 2014 WL 3898086, at *6 (D. Ariz. Aug. 11, 2014) ("[T]he ALJ was free to determine that the apartment manager position involved substantial gainful activity even if it did not involve physical labor.")

The SSA's guidelines on work activity indicate that if a claimant's "duties require use of [his] experience, skills, supervision and responsibilities, or contribute substantially to the operation of a business, this tends to show that [he has] the ability to work at the substantial gainful activity level."  20 C.F.R. §§ 404.1573(a).  As noted, work may also be substantial even if done on a part-time basis.  20 C.F.R. § 404.1572(a).  Viewed in conjunction with defendant's own admissions at the plea hearing, the preponderance of the evidence supports a finding that, as Coleman put it, Hynek performed substantial gainful activity that was meaningful to the business of his father in "a mental sense," in that he "had much involvement . . . in the operations of the organization."  (Dkt. #127 at 123.)

However, before Hynek actually became involved in the acquisition and running of Spring Printing in January of 2014, the court is unable to find more probably than not that he was performing at a consistent level that an employer (other than the defendant's father) would have hired and paid him above the SSA threshold.  For that reason, the court finds

16

the amount of the SSA's loss for guideline calculations and restitution begins at that point, and total $98,256.

## II.    Duty to Report Material Change in Condition

As for his obligation to report his activities to the SSA and to Thrivent, and in effort to avoid any loss credited to him, Hynek maintains that he reported to both.  As to the SSA, Hynek represents that he regularly reported his work and other activities *in person* by driving nearly two hours from his home in Lone Rock, Wisconsin, to the SSA office in La Crosse, Wisconsin, at least once a year, and speaking with a counter or customer service employees, who invariably told him that his work activities were never substantial enough to even report.  While Hynek attempted to prove those visits by producing counter tickets from 2016, there is *no* documentation corroborating regular trips dating back to 2007, much less alleged disclosures by Hynek to SSA and approval by "counter workers" down the years.  Not only is defendant's credibility in substantial doubt with respect to these claims, but he admitted during the evidentiary hearing to be someone who will exaggerate his achievements or downplay them as events may require, either out of a need to aggrandize himself or deflect responsibility.  Moreover, as Coleman testified, SSA frontline employees are not trained to give advice on what activity to report or not report, nor to determine what ultimately is deemed substantial gainful activity.  (Dkt. #127 at 107.) Finally, while defendant argues that no office always runs as it should, if Hynek had actually been reporting the varied work activity that he acknowledges having engaged in over the years, some formal documentation or an activity referral would likely have

occurred at some point. Tellingly, neither the SSA nor defendant have any record of Hynek disclosing any work performed or planned to the SSA until early 2015, when he started disclosing limited hours after the SSA investigation had already begun.[4] (Dkt. ##106-1 at 1-9, 39, 132-1 at 4.)

As for Thrivent, Hynek testified at the evidentiary hearing that he had not disclosed *any* of his admitted, ongoing work activities on his continuing disability forms from 2007 through 2016. (Dkt. #129 at 61-63.) A Thrivent representative credibly testified that had these activities been properly disclosed, the insurer would have terminated Hynek's benefits in May 2007. (Dkt. #127 at 190-91.)

While Hynek self-servingly testified he was told by his claims adjuster after converting to long-term disability (when his condition did not improve after the first two years of temporary disability payments) *not* to include such work information on his forms, unless work activity began to take up "half of [Hynek's] day or something" (dkt. #129 at 80), that statement early in the timeline of this case did not legally absolve him from ever reporting any work, especially during periods when his contributions to his father's printing business appear to have been substantial. Hynek also testified that he regularly spoke with a Thrivent representative, who would often visit the print shop on personal business "about

---

[4] Neither does defendant's pointing to a disability update form that Hynek allegedly completed with SSA staff assistance in 2014 move the needle in his favor. The form cryptically indicates both "yes" and "no" in response to the question asking whether the beneficiary had "worked for someone or been self-employed" within the past two years. (Dkt. #122 at 1.) No information on the form itself explains that ambiguous answer or documents when any possible work activity began or ended, nor how much he was paid. If anything, this form suggests the equivocal nature in which he viewed his reporting obligations *and* the likelihood that true candor would have prompted SSA to begin a formal inquiry sooner. Regardless, Hynek's testimony on his supposed, robust reporting activities as to the SSA is not credible.

18

kids or friends or church or whatever," and this representative would advise Hynek on "what [he] should be doing and what [he] should not be doing and that kind of stuff," without ever questioning his doing work at the shop.  (Dkt. #128 at 87-88.)  Having informal conversations with a representative who is out running errands is also not equivalent to fulfilling a regular obligation to report work activities on a written form to the insurer.  Accordingly, the court has little difficulty concluding that Hynek also failed to report these work activities to Thrivent after 2007.

## III.   Payments After May 20, 2016

Finally, on May 20, 2016, there is no dispute that Hynek's treating physician indicated a change in his lifting restriction from one to two pounds to 10 to 20 pounds on a disability form completed for Thrivent.  (Dkt. ##116-15 at 2-3, 128 at 14.)  Defendant's own vocational rehabilitation expert testified that this change was "consistent with light work" as opposed to "sedentary work," noting that Hynek's restrictions on standing, walking, and sitting were also liberalized from 1-2 hours to 2-4 hours.  (Dkt. #128 at 14.)  Although the expert opined that there still would not have been work for Hynek in the general labor market, Hynek expressly admitted during the evidentiary hearing that he knowingly failed to report this change in his condition in order to ensure that he would continue receiving his disability payments.  (Dkt. #128 at 104-05.)  This admission most clearly cuts to the core of the fraudulent conduct underlying the offense of conviction, so all payments made after this material change in his medical condition must be attributed to Hynek's fraud as well, although again the court would only be guessing as to the amount

of actual loss to Thrivent, if any, as evidence by the fact that it continued to make at least partial disability payments into 2018.[5]

For all these reasons, the court finds that the government has established by a preponderance of the evidence a total loss amount to SSA of $98,256 for purposes of the USSG calculations.

ORDER

IT IS ORDERED that the total loss amount is $98,256.00 as set forth above.

Entered this 12th day of March, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[5] Hynek received his last SSA payment on May 25, 2016.